# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

the cellular telephone assigned call number 414-732-0585, (the "Target Cell Phone"), and location of Target Cell Phone, whose wireless service provider is T-Mobile, a company headquartered in Parsippany, New Jersey

)
)
)
)
)
)

Case No. 18-M-1251

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:
- ☐ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☒ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18 U.S.C. § 1951(a)

The application is based on these facts: See attached affidavit.

☒ Delayed notice of __30__ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Todd Higgins, DEA
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: 4/24/18

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin     Honorable William E. Duffin, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Todd Higgins, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **414-732-0585**, (the "Target Cell Phone"), whose service provider is T-Mobile, a wireless telephone service provider headquartered in Parsippany, New Jersey. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. I am a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation, and have been since 2014. In February of 2018, I was federally deputized as a Task Force Officer with the Drug Enforcement Administration. I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by the law to conduct investigations of and to make arrests for the offenses enumerated in 18 U.S.C. § 2516.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation,

and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that Dameion D. Wyatt has violated 18 U.S.C. § 1951(a) (sex trafficking by force, fraud, or coercion) and interstate travel for purposes of prostitution in violation of Title 18, United States Code, Sections 2421(a). Dameion D. Wyatt was indicted by a grand jury sitting in the Eastern District of Wisconsin on April 24, 2018 with five counts of sex trafficking of an adult by force, fraud, or coercion in violation of Title 18, United States Code, Section 1591(a); one count of sex trafficking of a child in violation of Title 18, United States Code, Section 1591(a); one count of interstate transportation of a child for purposes of engaging in prostitution and unlawful sexual activity, in violation of Title 18, United States Code, Section 2423(a); and three counts of interstate travel for the purposes of engaging in prostitution, in violation of Title 18, United States Code, Section 2421(a). The indictment is sealed and Wyatt is the subject of an arrest warrant issued on April 24, 2018. There is also probable cause to believe that the location information described in Attachment B will assist law enforcement in arresting Dameion D. Wyatt, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

2

## PROBABLE CAUSE

5. During the course of the sex trafficking investigation of Dameion D. Wyatt, case agents interviewed multiple adult victims and a juvenile victim. For example, AV-1 stated that in the beginning of 2012, she and her friend AV-2 met a man via a dating social media application called "Plenty of Fish." At the time, AV-1 and AV-2 were in Madison, Wisconsin and AV-1 stated that AV-2 was selling marijuana at the time and wanted to meet with the man (Wyatt) because she believed that Wyatt had connections with a marijuana supplier. AV-1 stated that she and AV-2 met with Wyatt on the west side of Madison, WI and at the time, Wyatt was driving a black rental sedan. AV-1 stated that after she and AV-2 entered the vehicle, Wyatt locked the doors and stated that he wanted to take them to Milwaukee to meet with a marijuana connection. While Wyatt was driving from Madison to Milwaukee, AV-1 asked Wyatt to stop and let her out numerous times. Wyatt refused. AV-1 stated that she did not have a cellular telephone with her because she was unemployed at the time. She stated that when they arrived in Milwaukee, Wyatt said that he had to stop at his residence, which was subsequently identified as 1727 W. Keefe, Milwaukee, WI.

6. Once at his residence, Wyatt took AV-1 and AV-2 upstairs to what appeared to be a second living area. According to AV-1 and AV-2, the upstairs closet was filled with "stripper clothing" and other women's clothing of all different colors and sizes. AV-1 also remembered locks on the doors, which allowed Wyatt to lock her inside the residence. Wyatt told AV-1 and AV-2 that his "bitch" was in jail and that she and AV-2

3

needed to make him some money, which Wyatt stated meant they had to "sell their ass." Wyatt stated that they had to stay upstairs and that they could not go downstairs. They both asked to go back home, and Wyatt stated that he was not taking them back and that they had to make money or things would go badly for them. AV-1 was scared and felt that there was no way to escape.

7. The first night at the house, AV-1 and AV-2 were forced to sleep naked in the upstairs bedroom. She stated that they were discussing escaping from the residence and Wyatt overheard them, entered the room, and backhanded AV-1 across her face, causing bruising to her eye. The next day, Wyatt told AV-1 and AV-2 to take clothes from the closet, which was filled with short dresses and high heels, and pack a suitcase. Wyatt took AV-1's real identification card and had AV-1 choose an identification card from a stack of approximately 50 identifications cards, which included photos of girls that were of every, shape, size, and color. Wyatt instructed AV-1 to take an identification card that looked the most like her and memorize the information on it. Later that day, Wyatt drove AV-1 and AV-2 to Chicago and had them "walk the track" to find prostitution dates. During the first week, Wyatt drove them to Chicago and back to Milwaukee multiple times. Eventually most of the "dates" were arranged via Backpage ads

8. AV-1 stated that Wyatt instructed her how to ask certain questions of the "john" to confirm he was not law enforcement. Wyatt had other rules for AV-1 including: no dates with black males; she was not allowed to look up at people; she had to open the door for Wyatt in public, and AV-1 was not allowed to sit. After "dates," Wyatt would

4

"strip search" her to confirm that she did not conceal any money she earned during a date. Wyatt would sometimes force her to stay awake for days to work, including on one occasion forcing AV-1 to stay awake for approximately 80 hours to engage in commercial sex acts with strangers for Wyatt's benefit. Wyatt would give her MDMA so that she could stay awake to perform prostitution dates for his benefit.

9. After one trip to Chicago, Wyatt became angry with AV-1 and pushed her head into the driver's side window, breaking the window and causing injury to AV-1's head. Once they got back to Milwaukee, Wyatt forced AV-1 to take off her clothes and he dragged her into the basement. While bringing her to the basement, Wyatt was punching AV-1. Wyatt put AV-1 into a back room of the basement, which did not have any light. Wyatt tied a dog chain around her wrists and tied her to a pole. He left her in the room naked, with no food or water, tied up using a dog chain for almost four days. During two of the four days, Wyatt put his dog in the room with AV-1. AV-1 stated that she screamed until she finally gave up. AV-1 stated that the dog barked constantly during the two days and AV-1 stated she felt she was going to die. She stated that she suffered from hypoglycemia and that she could barely move when Wyatt finally brought her back upstairs. AV-1 stated that Wyatt treated his dog better than he treated his girls.

10. A few months later, AV-1 recalled that she had a date in Chicago with a younger black male. AV-1 provided all of the money to Wyatt, but Wyatt became angry because the date was with a black male, breaking one of his rules. Wyatt drove AV-1 back to Milwaukee, and during the car ride, he said nothing. Once at the residence, Wyatt

5

handcuffed AV-1 to a pole in the basement. She said she had never seen Wyatt so angry, and she begged Wyatt not to leave her in the basement again. Wyatt went back upstairs, obtained a belt, and brutally lashed AV-1 approximately 75-100 times. AV-1 passed out. She was left in the basement for approximately one day and was forced to urinate on herself. When Wyatt brought her upstairs, he had to carry her. When looking at her injuries from the beating, Wyatt said, "Oh my God." AV-1 stated that after she was beaten and left in the basement, Wyatt bathed her, put lotion on her body, and then raped her. That same day, Wyatt posted an ad on Backpage.com and forced AV-1 to do dates in Lacrosse, WI.

11. AV-1 stated that she did not do many dates in Milwaukee, WI but that Wyatt took her to La Crosse, WI, Minneapolis/St. Paul, MN; Chicago, IL; Kissimmee, FL, and various towns and cities in Indiana, including Kokomo, IN, Indianapolis, IN, to perform dates. AV-1 estimated that when she was "walking the track" in Chicago, she would do anywhere from 2-10 dates per night, and that she was typically in Chicago 2-3 times each week when they were not on the road.

12. On February 1, 2017, in connection with a drug trafficking and sex trafficking investigation, case agents obtained a state court warrant approving the installation and use of a Trap and Trace device, a Pen Register device and location monitoring for the cellular telephone number **414-732-0585** (Target Cell Phone), which was being used by Dameion Wyatt at the time. At that time, the Target Cell Phone's service provider was Sprint Spectrum and subpoenaed subscriber information revealed

6

that the Target Cell Phone was subscribed to Damion Albright with an address of PO BOX 15955 in Lenexa, KS. In March of 2017, case agents obtained an extension of the state court warrant authorizing the Pen Register, Trap and Trace, and location information for the Target Cell Phone. During February and March of 2017, while case agents were obtaining the location information for the Target Cell Phone, case agents conducting surveillance of Wyatt confirmed that Wyatt was using the Target Cell Phone.

13. In April of 2018, case agents subpoenaed subscriber information and call detail records for the Target Cell Phone. As of April of 2018, the service provider for the Target Cell Phone was T-Mobile USA and subpoenaed subscriber information revealed that the Target Cell Phone was subscribed to Damien Wyatt with a listed address of 3131 S. 100th Street, Milwaukee, WI. Case agents analyzed the call detail records from February and March of 2017 and the call detail records from March 20, 2018 through April 19, 2018, and based upon the calling patterns and top callers, case agents believe that Dameion D. Wyatt continues to use the Target Cell Phone. Review of call detail records from early 2017 and the call detail records from March and April of 2018 reveal similar calling patterns, including numerous overlapping top callers. For example, during both time periods, phone number 414-916-1522 was one of the Target Cell Phone's most frequently called numbers and 414-391-0988, which according to law enforcement and public databases is used by Jacqueline Wyatt, Wyatt's mother, was another one of the most

7

frequently called numbers. Based upon the common call analysis, case agents believe that Dameion D. Wyatt is still utilizing the Target Cell Phone.

14. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

15. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with

8

such other reference points as may be reasonably available. Based on my training and experience, I know that T-Mobile can collect cell-site data about the Target Cell Phone.

## AUTHORIZATION REQUEST

16. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

17. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

18. I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile for a time period of 45 days from the date the warrant is signed. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

19. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

# ATTACHMENT A
## Property to Be Searched

1. The cellular telephone assigned call number 414-732-0585, (the "Target Cell Phone"), whose wireless service provider is T-Mobile, a company headquartered in Parsippany, New Jersey.

2. Information about the location of the Target Cell Phone that is within the possession, custody, or control of T-Mobile.

## ATTACHMENT B
### Particular Things to be Seized

All information about the location of the Target Cell Phone described in Attachment A for a period of forty-five days from the date the warrant is signed, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government. In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

2